UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MONTRELL LAMAR HALL,

    Petitioner,

v.

JEFF MACOMBER, Warden,

    Respondent.

_____/

No. C-13-2531 EMC (pr)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I. INTRODUCTION

Montrell Lamar Hall filed this *pro se* action seeking a writ of habeas corpus under 28 U.S.C. § 2254. In his petition, he contends that he received ineffective assistance of appellate counsel. Specifically, he contends that appellate counsel failed to argue on appeal that trial counsel was ineffective in not objecting to the portion of his sentence that included an allegedly improper enhancement for acting "in concert." Mr. Hall's claim is premised on his misunderstanding of the facts. Under the evidence and verdicts that actually existed, there was no sentencing error to which trial counsel reasonably could have objected; therefore, appellate counsel was not ineffective in failing to argue that trial counsel was ineffective on this point. The petition will be **DENIED**.

## II. BACKGROUND

A.    <u>The Crimes</u>

The California Court of Appeal described the evidence regarding the home invasion that led to the conviction of Mr. Hall and Darryl Hudson for first degree murder, robbery, and burglary with enhancements.

Rex Farrance and his wife, Lenore Farrance, were living at 86 Argosy Court in Pittsburg in January 2007. FN5  Some months before that time, the Farrances discovered their 20–year–old son, Sterling, was growing marijuana in his closet in the home. Sterling explained to his parents he had a medical prescription to use and grow marijuana for himself. Rex decided to assist Sterling, and worked with him to expand the growing operation into the house's unused attic.  Sterling was also assisted by his childhood friend, Michael Mikulik, who also had a medical marijuana prescription.

> FN5.  For the sake of clarity and meaning no disrespect, when two or more family members referred to herein bear the same surname, we will refer to them by their first names.

Sterling moved out of the Argosy Court residence in October 2006, but he remained involved in the growing operation with Rex, as did Mikulik to a lesser extent.  According to Sterling, they had gone through three or four grow-and-harvest cycles in the attic, with the last one occurring less than a week before his father was killed.  Sterling estimated each harvest would yield approximately one pound of marijuana at the most, which would have had a street value of $3,500 to $4,500 at that time  At the time his father was killed, they had plants growing in the closet and attic, and harvested marijuana drying in the garage.  Sterling thought the amount in the home at that time was worth "probably less" than $4,000. According to Sterling, who testified under a grant of immunity, none of the marijuana grown in the home was sold.  He and Mikulik smoked some of it themselves, and gave the rest away to friends.  Neither Sterling nor Mikulik believed Rex sold any of the marijuana.  Mikulik had the impression Rex, who worked as a senior technical editor for PC World magazine, viewed the growing operation as an enjoyable hobby.

On January 9, 2007, Lenore was bedridden while recovering from foot surgery the day before.  Rex stayed home from work to take care of her.  Sterling and Mikulik came by at 4:00 p.m. or 5:00 p.m. that day, but both had left by later that evening.  In the evening, Lenore heard a loud bang followed by her dog barking.  Then Rex burst into the bedroom saying, "Some guys are breaking in." He went to his side of bed, and reached under the bed where he kept handguns locked in a safe.  Within seconds, he was overtaken by three men who followed him into the room.FN6

> FN6.  In the first trial, Lenore testified three men entered the bedroom and another was in the hall.  In the second trial, she testified four men entered and two went back out into the hall.  Amos, who was one of the men who entered the home, testified there were four of them, but he denied knowing the fourth man's name.

The intruders all wore black clothes and dark masks, but Lenore could see their skin above the gloves they wore and at the eye holes of some of their masks.  Based on that, as well as from their size, body type, and voices, Lenore testified she could tell all four were Black males.  All of the men in the room had guns.  They demanded money and threatened to kill her if none was found.  As one intruder held Rex at gunpoint, another grabbed Lenore by her throat and nightgown, pulled her off the bed onto her injured foot, and said, "Where is the money, bitch?" After searching unsuccessfully for an envelope of emergency money in her husband's top dresser drawer, she was struck on the back of the head and collapsed to the floor, bleeding from the wound to her head.  She hear Rex gasp, then saw in "slow motion" the barrel of the gun held on him turn red and the fabric of his shirt "splay open" as he was shot in the chest.  She believed Rex gasped because he saw blood coming out of her head. The intruders ran and were gone.  Lenore was able to reach Rex where he lay in the bedroom doorway with his legs in the bedroom.  A nurse by profession, Lenore tried to do CPR while she called 911 on the bedside phone.  The call was received at 9:11 p.m. and police responded to the scene at 9:14 p.m.

Rex was taken by ambulance to John Muir Medical Center where he was pronounced dead at 9:59 p.m. An autopsy revealed Rex died of a single gunshot wound to his right chest. Based on the shape and location of the entrance and exit wounds, it appeared the victim was shot from above while on his knees or buttocks, by an assailant standing a few feet away. Police found an expended .22–caliber bullet on the carpet at the entrance to the master bedroom of the Argosy Court residence.

At the crime scene, investigators found the front door splintered, several bags of marijuana in the hallway, and a pervasive odor of marijuana throughout the residence. The master bedroom had been ransacked and the mattress had been pulled off of the bed. Officers found bags containing trimmed marijuana in the bedroom. An envelope containing $700 in currency was found in a dresser drawer. A narcotics officer found mature marijuana plants hanging in the garage, and 75 immature plants in the attic, as well as 11 glass jars of marijuana in the master bedroom. Interviews with Lenore and Sterling established that the gun safe under the bed, containing four handguns registered to Rex, was missing from the home.

On January 15, 2007, following pursuit of a fleeing vehicle in Bay Point, police arrested the vehicle's occupants and recovered a .22–caliber handgun that had been tossed from it during the pursuit. The car was registered to Cleothius Amos, and the vehicle's driver and passenger were Amos's brothers. Two .22–caliber bullets were found in the front seat. A firearms expert who examined the handgun later reported his "100 percent certain" opinion it had fired the bullet found at the scene of Rex Farrance's murder. Amos, who was arrested on January 21, 2007 after a police chase in Sacramento, initially denied any knowledge of the Farrance robbery-murder. At the end of May 2007, the police investigating the robbery-murder learned Hall and Hudson had been with Amos in Sacramento on January 21, and Amos's girlfriend, Sabrina Bagsby, had been a passenger in the vehicle he was driving when he was arrested on that date.

On June 1, a Browning .22–caliber semiautomatic pistol registered to Rex Farrance was recovered when the police assisted Bagsby in retrieving her possessions from the home of her ex-boyfriend, Omar Zuniga. Five days later, police interviewed Jalil Aldridge, who had obtained the Browning .22 from Hudson and arranged for its sale to Zuniga. Aldridge confirmed Zuniga's statement that Amos, Hudson, and Hall were involved in the Farrance robbery-murder. When Amos was interviewed again in September 2007, he confessed his involvement in the events of January 9, and implicated Hall and Hudson. Although he initially portrayed the events falsely as a marijuana purchase gone bad rather than a robbery—a scenario his interrogators proposed to get him to admit his involvement—he provided information and leads that enabled the police to identify the other defendants and gather evidence of their involvement.

Eventually, Amos provided the following account of the events of January 9: Amos was called that day by Hall about doing a "weed and money lick," FN7 which Hall said would be "easy." Amos was not surprised about the call because Hall and Hudson knew Amos had done robberies before. Amos was with Sabrina Bagsby at the time. He dropped her off and drove to a house on Harbor Street in Pittsburg to meet with Hall and Hudson and another man he did not know, at about 7:00 or 8:00 o'clock that evening, to plan the robbery.FN8 Amos asked Hall questions about the robbery and Hall answered them.

> FN7. "Lick" is slang for a robbery.
>
> FN8. The house was leased to a friend of Hall's and Hudson's named James High. High's mother, Linda High, was a cosigner on the lease. Hudson lived at the Harbor Street house and Hall sometimes stayed there. James High saw Hudson many times with a small .22–caliber pistol or "deuce deuce" that he routinely carried.

3

Amos and Hall, armed with automatics, Hudson, armed with a .22–caliber revolver, and the fourth man, unarmed, left the Harbor Street house dressed in dark clothes and carrying masks. Following Hall's directions, Amos drove them in his Ford Probe to 86 Argosy Court, where Hall and Hudson entered first and headed toward the back of the house, followed by Amos and the fourth man after they searched to make sure no else was in the house. In the bedroom, Amos saw a woman on the bed. He heard Hall or Hudson say someone else was in the house and threaten to kill the woman if she did not tell them where the other person was. At that point, a man came up from behind the bed with his hands up and the fourth man began to hit him with his fists. Amos began searching the room for things to take, and picked up a wicker basket with 25 or 30 glass jars of marijuana and left the room, grabbing a bag of loose marijuana he carried with the wicker basket to his car. Amos put the marijuana in the trunk and went back into the house. When he went back in, the others were searching the bedroom and had flipped up the mattress on the bed. Amos left to search the front of the house. After about a minute he heard a shot. He ran to the car, and Hall and the fourth man came right out behind him. Then Hudson came out carrying a gun safe. Hudson ran back inside once more and came back out with two laptop computers. As soon as Hudson got into the car, Amos drove off. There was an argument in the car. Hall told Hudson he was stupid for shooting the man, and Hudson replied he had only shot him in the leg.

James High told detectives that Hudson, Hall, and Amos returned to the Harbor Street house on January 9 carrying bags of marijuana and a gray metal box, excited because they had "hit a lick and come up big." They watched a news story about the crime on television and were "laughing and acting jovial" at first. When they heard the man had been killed, they seemed shocked and quieted down. Hudson used the television's rewind function to play the news report over and over again.

Rex Farrance's gun safe was ultimately recovered from a backyard behind the Harbor Street house. A laptop computer Linda High had sold to a third person on behalf of Hudson for $250 or $350 was also identified as one of Rex's computers taken from the house. Amos testified Hall sold a half-pound of the marijuana the evening of the robbery and gave each of them $450 of the proceeds.

Resp. Ex. C6, Cal. Ct. App. Opinion, pp. 3-7.

B.  <u>Procedural History In State Court</u>

The California Court of Appeal described the charges and convictions:

Hall and Hudson were charged by information with the murder of Rex Farrance (Pen.Code,FN1 § 187; count one), the first degree residential robberies of Rex and Lenore Farrance (§ 211/212.5, subd. (a); counts two and three), assault with a firearm upon Lenore Farrance (§ 245, subd. (a)(2); count four), and the first degree residential burglary of the Farrances' home (§ 459/460, subd. (a); count five). Count one was accompanied by the special circumstances allegations the murder was committed in the commission and attempted commission of robbery and in the commission and attempted commission of burglary (§ 190.2, subd. (a)(17)). Each of the five counts included gun use enhancement allegations against Hall and Hudson (§ 12022, subd. (a)(1)), and the residential robbery charge included an allegation the defendants voluntarily acted in concert with two or more other persons (§ 213, subd. (a)(1)(A)).FN2

    FN1.  All statutory references are to the Penal Code unless otherwise specified.

    FN2.  The information originally charged codefendant Cleothius Amos with the same offenses and enhancements as Hall and Hudson. During jury selection, Amos pleaded guilty to voluntary manslaughter, admitted a principal was armed with a

4

> firearm, agreed to testify truthfully, and was promised a sentence of 16 years 4 months. The information was amended at that time to reflect Amos's plea.
>
> Following a jury trial in May and June 2009, Hudson was found guilty of all charges, but the jury deadlocked and the court declared a mistrial as to Hall. Hall was retried in September and October 2009. The second jury found him guilty of all charges, and found the special circumstance and firearm enhancement allegations true.
>
> The trial court sentenced both defendants to life without the possibility of parole for the special circumstances murder with firearm use of Rex Farrance. Hudson was given an aggregate determinate sentence of eight years for counts two through five with enhancements, FN3 and Hall received 11 years for these offenses and enhancements. FN4
>
>> FN3. Hudson's eight-year determinate term consisted of the midterm of six years for the robbery of Rex, plus a one-year gun use enhancement for that conviction, and a consecutive term of one year (one-third the midterm) for the assault on Lenore. Hudson also received the following concurrent terms: six years for the robbery of Lenore, a one-year gun enhancement for that robbery, a midterm sentence of four years for the burglary and a one-year sentence for the burglary gun enhancement.
>>
>> FN4. Hall's 11–year determinate term consisted of the aggravated term of nine years for the robbery of Rex, plus a one-year gun use enhancement for that conviction, and a consecutive term of one year (one-third the midterm) for the assault on Lenore. Hall also received the following concurrent terms: nine years for the robbery of Lenore, a one-year gun enhancement for that robbery, a midterm sentence of four years for the burglary and a one-year sentence for the burglary gun enhancement.

Cal. Ct. App. Opinion, p. 2.

Mr. Hall and Mr. Hudson appealed. The California Court of Appeal affirmed the judgments of conviction, with a minor sentence modification. Specifically, the court determined that state law required that two of the crimes warranted stayed sentences rather than concurrent sentences. Cal. Ct. App. Opinion, pp. 17-18. The state appellate court therefore modified the judgments for both Mr. Hall and Mr. Hudson to stay the sentences for count three (i.e., the robbery of Mrs. Farrance) and count five (i.e., the burglary). *Id.* at 18.

Mr. Hall was unsuccessful in his further state court efforts to challenge his conviction and sentence. The California Supreme Court denied his petition for review. The California Supreme Court also denied his petition for writ of habeas corpus.

Mr. Hall then filed this federal habeas action. His federal petition asserts a single claim that his appellate attorney provided ineffective assistance by failing to argue on appeal that his trial attorney had provided ineffective assistance in not arguing a sentencing error. The specific sentencing error that Mr. Hall claims is that he should not have received the 9-year sentences on

count two and count three for a robbery committed "in concert" because the verdict for Mr. Hudson did not permit such sentences for Mr. Hall. The issue is largely a matter of principle with no real impact on the petitioner's liberty because it concerns the length of the determinate sentence Mr. Hall should serve after he serves his sentence of life without the possibility of parole.

### III. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Contra Costa County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

### IV. EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c). State judicial remedies have been exhausted for the claim in the petition.

### V. STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

Mr. Hall presented his ineffective assistance of appellate counsel claim in his petition for writ of habeas corpus to the California Supreme Court, which rejected it without discussion. *See* Resp. Exs. E1 and E2. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784-85 (2011) (one-sentence order denying habeas petition analyzed under §2254(d)); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) (order discussing state law claim but not federal claim rebuttably presumed to be rejection on the merits and therefore subject to § 2254(d)). Mr. Hall does not dispute that the California Supreme Court decided his claim on the merits.

## VI. DISCUSSION

A. <u>Ineffective Assistance of Counsel Standards</u>

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *See Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668, 686 (1984). A defendant must show that

1 appellate counsel's advice fell below an objective standard of reasonableness and that there is a
2 reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on
3 appeal. *Miller v. Keeney*, 882 F.2d 1428, 1434 & n.9 (9th Cir. 1989) (citations omitted).  Appellate
4 counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a
5 defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).  The weeding out of weaker issues is
6 widely recognized as one of the hallmarks of effective appellate advocacy. *See Miller*, 882 F.2d at
7 1434; *see also Jones*, 463 U.S. at 751-52.

8 　　　To prevail on a Sixth Amendment ineffectiveness of *trial* counsel claim, a petitioner must
9 establish two things.  First, he must demonstrate that counsel's performance was deficient and fell
10 below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*,
11 466 U.S. at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient
12 performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors,
13 the result of the proceeding would have been different." *Id.* at 694.  In order to prevail on a claim
14 under California law for ineffective assistance of trial counsel, the same two items must be shown,
15 i.e., deficient performance and resulting prejudice. *See In re Roberts*, 29 Cal. 4th 726, 744-45 (Cal.
16 2003).

17 　　　To resolve Mr. Hall's claim that appellate counsel should have argued on appeal that trial
18 counsel was ineffective in not challenging a sentencing error, the best point to start is to determine
19 whether any sentencing error actually occurred. *See Moormann v. Ryan*, 628 F.3d 1102, 1106-07
20 (9th Cir. 2010) (to determine whether appellate counsel was ineffective in not presenting a claim on
21 appeal, court first assesses the merits of the underlying claim).  Mr. Hall contends that it was error
22 for the trial court to impose enhanced sentences on count two and count three for a robbery within
23 an inhabited dwelling committed "in concert with two or more other persons" because a jury had
24 rejected the allegations that Mr. Hudson acted in concert with him. *See* Docket # 1 at 8 (trial
25 counsel failed "to object to sentencing court violating his due process in imposing the instance
26 sentence minus jury's determination that he acted in concert with co-defendant 'Hudson' to commit
27 all the offense charged").

28

B.   Proceedings In State Court With Regard to Count Two and Count Three:

The Information originally charged Mr. Hall, Mr. Hudson, and Mr. Amos with two counts of first degree residential robbery and other crimes. Pursuant to a plea bargain, Mr. Amos entered a guilty plea before trial began and the Information was amended by handwritten notations to delete references to him. *See* Clerk's Transcript ("CT") 378-81. With those amendments, the Information charged in count two that Mr. Hudson and Mr. Hall had committed first degree residential robbery, *see* Cal. Penal Code §§ 211/212.5(a), as follows: On or about January 9, 2007, Mr. Hudson and Mr. Hall "by means of force and fear, did unlawfully take personal property from the person, possession, and immediate presence of Rex William FARRANCE, who was in and on an inhabited dwelling house. [¶] It is further alleged, pursuant to Penal Code section 213(a)(1)(A), that the Defendants each voluntarily *acted in concert with two or more other persons* in the commission of the above described offense." CT 379 (emphasis added). Count three of the Information had the same allegations, except that it identified the second victim, Lenore Vantosh Farrance. CT 380.

A trial was held in June 2009. At that trial, the jury found Mr. Hudson guilty on all counts but was unable to reach a verdict with regard to Mr. Hall. A new trial was held for Mr. Hall in October 2009, at which a new jury found him guilty on all counts.

With regard to count two and count three, the jury returned the following verdicts for *Mr. Hudson*: As to count two, the jury (a) found Mr. Hudson guilty of robbery of Mr. Farrance, (b) found the robbery to be first degree robbery, and (c) found true the allegation that Mr. Hudson was armed with a firearm in the commission of the offense. The jury made the same findings for count three (i.e., the parallel charge for the robbery of Mrs. Farrance). RT 1541-42 (reading of the verdict in court); CT 812-15 (verdict form); CT 1116 ("report and sentence commitment to state prison" signed by court clerk); *see also* CT 1119-22 (abstract of judgment). The transcript, verdict, report and sentence commitment form, and the abstract of judgment for Mr. Hudson do not mention the "in concert" allegations.[1]

---

[1] The parties do not explain what became of the allegations in the Information that Mr. Hudson committed the robbery in concert. There is no evidence that the jury found "not true" the allegation that the robbery was committed in concert. Respondent asserts that Mr. Hudson was found to have acted in concert, and Mr. Hall asserts that the jury found Mr. Hudson not guilty of that

With regard to count two and count three, the jury returned the following verdicts for *Mr. Hall*: As to count two, the jury (a) found Mr. Hall guilty of robbery of Mr. Farrance, (b) found the robbery to be first degree robbery, (c) found true the allegation pursuant to California Penal Code § 213(a)(1)(A) that "the defendant voluntarily acted in concert with two or more other persons in the commission of the above-described offense," CT 1087, and (d) found true the allegation that Mr. Hall was armed with a firearm in the commission of the offense. *See* CT 1087-88 (verdict form); CT 1112 ("report and sentence commitment to state prison" signed by court clerk); *see also* CT 1123 (abstract of judgment). The jury made the same findings for count three (i.e., the parallel charge for the robbery of Mrs. Farrance).

The court imposed sentences on count two and count three reflecting that only Mr. Hall had been found to have acted in concert in the robbery. On count two and on count three, *Mr. Hudson* received a sentence of six years for the first degree robbery, plus a one-year enhancement for being armed with a firearm. CT 1117, 1119. *Mr. Hall* received a sentence that was three years longer: On count two and on count three, Mr. Hall received a sentence of nine years for the robbery, plus a one-year enhancement for being armed with a firearm. CT 1123.

C.   There Was No Sentencing Error

Under California law, robbery is divided into two degrees, with first degree robbery being punished more harshly than second degree robbery. Within the class of first degree robberies, robberies of inhabited dwelling houses committed in concert are punished more harshly. California has these sentencing triads for those convicted of robbery:

> (1) Robbery of the first degree is punishable as follows:
>
> > (A) If the defendant, voluntarily **acting in concert with two or more other persons**, commits the robbery within an inhabited dwelling house, . . . by imprisonment in the state prison for three, six, or nine years.
> >
> > (B) In all cases other than that specified in subparagraph (A), by imprisonment in the state prison for three, four, or six years.
>
> (2) Robbery of the second degree is punishable by imprisonment in the state prison for two, three, or five years.

particular offense, but the record supports neither assertion.

Cal. Penal Code § 213(a) (bold type added).

The few California cases located by this Court that discuss the issue are unpublished but do confirm that there must be at least two additional perpetrators for the robbery in concert sentencing provision, Cal. Penal Code § 213(a)(1)(A), to apply. *See People v. Brown*, No. C059165, 2010 WL 659910, at *5 (Cal. Ct. App. Feb. 24, 2010) (unpublished) (vacating sentence for lack of a factual basis for no-contest plea to first degree robbery in concert because the evidence was that the robbery was committed by defendant and only one other person); *People v. Villalpando*, No. F055664, 2010 WL 2657744, at *13-*15 (Cal. Ct. App. July 6, 2010) (unpublished) (where evidence showed that defendant, codefendant and a third party participated in the robbery, the acquittal of codefendant on all crimes did not bar defendant's conviction because consistent verdicts were not required); *see also People v. Richard*, No. B230579, 2013 WL 64467, at *10 (Cal. Ct. App. Jan. 7, 2013) ("Nothing in the statutory language of [§ 213(a)(1)(A)] suggests that the other two or more persons who acted in concert with the defendant must have entered the inhabited dwelling or that a defendant cannot be convicted of aiding and abetting an in-concert, home invasion robbery"); *id.* (no requirement that all perpetrators be present in the dwelling at the time of the robbery).

Mr. Hall urges that, without the robbery having been done in concert with Mr. Hudson, he could not have committed the robbery in concert. *See* Resp. Ex. E1 (Petition for Writ of Habeas Corpus filed in California Supreme Court), p. "I." It is true that the statute requires that there be at least two other participants for the in-concert provision to apply, but that requirement is satisfied here regardless of whether Mr. Hudson is counted, because four persons took part in the robbery. Even without Mr. Hudson, the other two perpetrators' involvement permitted the finding that Mr. Hall committed the robbery "in concert with two or more other persons." Cal. Penal Code § 213(a)(1)(A).

The jury's finding that Mr. Hall committed the robbery in concert was permissible based on the evidence that four intruders entered the Farrance home and committed the robbery. Mrs. Farrance testified at Mr. Hall's trial that four men initially entered the bedroom in which she was located and then two of them left for other parts of the residence. RT 1696-97, 1702. She testified that all four intruders were armed with handguns and were wearing ski masks and gloves. RT 1697.

1 Mr. Amos, who had entered a plea bargain before trial began, also testified there were four intruders.
2 Mr. Amos testified that he, Mr. Hall, Mr. Hudson and a fourth person drove together to the Farrance
3 residence. RT 1886-89. When they arrived, they pulled masks over their faces and entered; Mr.
4 Hall and Mr. Hudson went to the house first after one of them kicked the door in, and then all four
5 rushed inside. RT 1891-92. They went to the bedroom where Mrs. Farrance was. The fourth
6 person left the bedroom to check for Mr. Farrance, who the robbers had not yet located. CT 1893-95.
7 Mr. Farrance was then found in the bedroom. Mr. Amos found and took a basket of jars containing
8 marijuana, then left the bedroom to go to the front of the house to search for more property. RT
9 1897-1901. Mr. Amos returned to the back bedroom and saw that Mr. Hall and Mr. Hudson were
10 searching the room; Mr. Amos and the fourth person returned to the front of the house, while Mr.
11 Hall and Mr. Hudson remained in the bedroom. Shortly thereafter, Mr. Amos heard a single shot.
12 RT 1903-04. The four intruders then fled the scene. RT 1905-06. As this evidence establishes that
13 there were four perpetrators, and the robbery in concert statute requires that a defendant act with two
14 or more perpetrators, the numerical requirement for the statutory enhancement was satisfied,
15 regardless of whether Mr. Hudson is counted as one of the perpetrators.

16 Mr. Hall may be trying to argue that the verdict for him was impermissibly inconsistent with
17 the verdict for Mr. Hudson. The facts do not support his assertion, however. Mr. Hall contends that
18 the jury did not find Mr. Hudson guilty of count two and count three. *See* Resp. Ex. E1 (Petition for
19 Writ of Habeas Corpus filed in California Supreme Court), p. "H." That assertion is contradicted by
20 the jury's verdict that did find Mr. Hudson guilty of the crime of robbery in count two and count
21 three. *See* RT 1541-42; CT 812-15; CT 1116. Mr. Hudson also contends that the jury had rejected
22 the allegations that Mr. Hudson acted in concert with him. *See* Docket # 1 at 8; Resp. Ex. E1, p.
23 "B." The record does not support this assertion. As explained earlier in footnote 1 and the
24 accompanying text, the jury made no findings with regard to Mr. Hudson either way on the "in
25 concert" allegation. The record establishes that the jury found Mr. Hall had committed the robbery

in concert and made no finding with regard to whether Mr. Hudson did so. The verdicts were not inconsistent.[2]

Even if the verdicts had been inconsistent, Mr. Hall would not have been entitled to relief under state or federal law. Inconsistent verdicts are not impermissible under California law. *See People v. Lewis*, 25 Cal. 4th 610, 656 (Cal. 2001) ("It is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand."); *see e.g., Villalpando*, 2010 WL 2657744, at *13-*15 (unpublished) (where evidence showed that defendant, codefendant and a third party participated in the robbery, the acquittal of codefendant on all crimes did not bar defendant's conviction because consistent verdicts were not required). There also is no federal due process right to be free of an inconsistent verdict. The Supreme Court has determined that inconsistent verdicts do not make a trial fundamentally unfair. *See Standefer v. United States*, 447 U.S. 10, 25-26 (1980); *cf. Harris v. Rivera*, 454 U.S. 339, 344 (1981) (assuming *arguendo* that bench trial verdicts were facially inconsistent, "there is no federal requirement that a state trial judge explain his reasons for acquitting a defendant in a state criminal trial; even if the acquittal rests on an improper ground, that error would not create a constitutional defect in a guilty verdict that is supported by sufficient evidence and is the product of a fair trial"). Inconsistent verdicts may stand, even when one of the verdicts is a conviction and the other an acquittal because the acquittal may be an "exercise of lenity by the jury that is not necessarily grounded in its view of the evidence." *Ferrizz v. Giurbino*, 432 F.3d 990, 993 (9th Cir. 2005) (citing *United States v. Powell*, 469 U.S. 57, 65 (1984); *Dunn v. United States*, 284 U.S. 390, 393 (1932)). There was no reasonable argument for counsel to make that the in-concert robbery sentence was impermissible due to inconsistent verdicts.

---

[2] Insofar as Mr. Hall is attempting to argue some sort of general unfairness that he received a stiffer sentence than Mr. Hudson, that argument would fail. As the California Court of Appeal's recitation of the evidence shows, Mr. Hall was a major participant in the criminal episode. Mr. Hall organized the robbery, recruited armed participants, directed them to the residence, left the victim to die, instructed the other intruders how to leave the scene (i.e., walk, do not run), where to go after departing the residence, and was armed with an automatic weapon throughout. *See* Cal. Ct. App. Opinion, pp. 3-7, 15.

1    D.    <u>Appellate Counsel Was Not Ineffective In Not Presenting The Meritless Ineffective</u>
2          <u>Assistance of Trial Counsel Claim</u>

3    As the foregoing section shows, there was no sentencing error to which trial counsel should have objected. Since there was no error, trial counsel was not ineffective for not objecting to the robbery in-concert sentence. A lawyer need not file a motion or make an objection that is meritless on the facts and the law. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take futile action is not deficient performance); *Hebner v. McGrath*, 543 F.3d 1133, 1137 (9th Cir. 2008) (finding counsel's failure to object to admission of defendant's prior sexual misconduct as propensity evidence not ineffective where evidence would have been admitted in any event to show common plan or intent).

Given that trial counsel was not ineffective with regard to the in-concert robbery sentencing, it follows that appellate counsel was not ineffective in not presenting a claim on appeal that trial counsel provided ineffective assistance on this point. In other words, appellate counsel had no duty to present on appeal an issue that had no chance of succeeding. *See Moormann v. Ryan*, 628 F.3d 1102, 1106-07 (9th Cir. 2010) (if trial counsel's performance was not objectively unreasonable or did not prejudice the petitioner, then appellate counsel did not act unreasonably in failing to raise a meritless claim of ineffective assistance of counsel, and the petitioner was not prejudiced by appellate counsel's omission).

The California Supreme Court's rejection of Mr. Hall's ineffective assistance of appellate counsel claim was not contrary to or an unreasonable application of clearly established federal law. Mr. Hall is not entitled to the writ of habeas corpus.

E.    <u>A Certificate Of Appealability Will Not Issue</u>

Mr. Hall has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and this is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is **DENIED**.

**VII. <u>CONCLUSION</u>**

The petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.

IT IS SO ORDERED.

Dated: January 15, 2015

_____
EDWARD M. CHEN
United States District Judge